UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 08-80819-CIV-MARRA/JOHNSON

JOEL KAYE,

      Plaintiff

vs.

HUMANA INSURANCE COMPANY,

      Defendant.

_____/

## ORDER AND OPINION ON MOTION TO DISMISS

**THIS CAUSE** is before the Court upon Defendant, Humana Insurance Company

("Defendant" or "Humana")'s Motion to Dismiss (DE 11).  Plaintiff Joel Kaye ("Plaintiff" or

"Kaye") filed a response to the motion (DE 20) and Defendant filed a reply (DE 23).  The Court

held a hearing on the motion on January 7, 2009.  The Court has carefully reviewed the motion,

the response, and the reply, and is otherwise fully advised in the premises.

**Background**

On July 24, 2008, Plaintiff filed his Complaint against Defendants (DE 1).  Plaintiff

brings suit against Humana, his insurer, alleging claims for (Count I) breach of contract, (Count

II) fraud in the inducement, (Count III) intentional infliction of emotional distress, and (Count

IV) statutory bad faith.  The facts, as alleged in the Complaint, are as follows:

Plaintiff learned that he had an incurable form of prostate cancer in mid-2002. Compl. ¶

6-8.  He resolved to fight it as aggressively as possible, and underwent cancer treatments

begining in July 2002. Compl. ¶ 8-10.  Plaintiff's cancer treatments were covered by his

employer's health benefits plan and/or were continued through the Consolidated Omnibus

Budget Reconciliation Act ("COBRA"). Compl. ¶ 11-12.  Plaintiff began chemotherapy at the

University of Miami's Sylvester Cancer Center ("Sylvester" or "Sylvester Cancer Center") on

October 19, 2003. Compl. ¶ 11.  By November 2004, Plaintiff could not longer work.  Compl. ¶

17.  He applied for and received Social Security Disability and early Medicare. Compl. ¶ 17.

Plaintiff also underwent radiation treatment to treat spinal tumors. Compl. ¶ 17.  During the more

than five years Plaintiff was treated at Sylvester, he received oncology and medical services

including, but not limited to: MRIs, radiation, chemotherapy, PSI blood testing, PSA testing,

body and bone scans. Compl. ¶ 22.  Since 2005, except while insured by Humana, his medical

services and prescription drugs were covered by Medicare or a Medicare Advantage Plan.

Compl. ¶ 22.

In late 2005, Plaintiff contacted Defendant to determine whether it offered a plan that

would provide him greater benefits at a lower cost than traditional Medicare.  Compl. ¶ 26.

Shortly after Plaintiff contacted Defendant, Defendant sent its agent and sales representative Tim

Brennan ("Brennan") to Plaintiff's home. Compl. ¶ 27.  Plaintiff was told at all times, and he

accordingly believed, that Brennan was an employee/agent of Humana. Compl. ¶ 28.  These

representations were made by both Humana and Brennan, and a Humana business card was given

to Plaintiff at the initial consultation, representing Brennan as a Humana's sales representative.

Compl. ¶ 28.  At their first meeting in November 2005, Plaintiff advised Brennan of his prostate

cancer and continuing treatment at Sylvester Cancer Center. Compl. ¶ 29.  Brennan

recommended a Medicare Choice PPO, and Plaintiff specifically asked Brennan whether

Sylvester was an in-network health care provider under that plan. Compl. ¶ 29.  Brennan assured

Plaintiff that Sylvester was an in-network treatment center under the recommended policy, and that Plaintiff's sole obligation would be a $15/visit co-pay and a monthly premium of $15. Compl. ¶ 30.  Reassured, Plaintiff completed an application for the recommended Humana PPO insurance policy, assigning his Medicare benefits to Humana. Compl. ¶ 31.

Humana issued a Medicare Choice PPO insurance policy ("the Policy") to Plaintiff, effective from January 1, 2006 through December 31, 2006.  Compl. ¶ 32.  The Policy provides coverage through a regional PPO. Compl. ¶ 32.  Upon the Policy becoming effective, Plaintiff received a Certificate of Coverage dated March 9, 2006, setting forth his coverage history and describing his continuous coverage from June 30, 2003 until January 31, 2006. Compl. ¶ 33.  The Certificate was not accompanied by, nor did Plaintiff otherwise receive, either a Humana Evidence of Coverage ("EOC") booklet, nor a 2006 Provider Directory. Compl. ¶ 34. Throughout the Policy's entire first year, Plaintiff believed, in accordance with Humana's representations, that his Sylvester medical bills were being fully paid. Compl. ¶ 35.

In November 2006, Brennan telephoned Plaintiff to inform him that his premium was being increased to five times his 2006 rate. Compl. ¶ 36.  Puzzled and irritated, Plaintiff requested a personal meeting to discuss the renewal policy. Compl. ¶ 36.  Brennan met with Plaintiff, representing that nothing had changed with respect to the Humana Policy other than the increased premium, and confirmed that Slyvester was still a covered, in-network health care provider.  Compl. ¶ 37.  Brennan recommended continuing the same Humana Medicare Choice PPO plan. Compl. ¶ 37.  Placated, Plaintiff renewed his Policy. Compl. ¶ 38.  The renewal Policy was effective from January 1, 2007 through December 31, 2007. Compl. ¶ 38.

In November 2006, Plaintiff received Humana's 2007 Provider Directory and EOC

booklet. Compl. ¶ 39.  It was the first such document that Plaintiff received. Compl. ¶ 39.

The 2007 EOC booklet states that Humana "provides medical services through Medicare-certified health care facilities." Compl. ¶ 40.  The EOC booklet also recommends to policy holders that they confirm whether services being received are provided through a plan provider. Compl. ¶ 40.  The EOC booklet further informs policy holders that:

> Every year as long as you are a member of a HumanaChoicePPO, [Humana] will send [the insured] a Provider Directory, which gives [the insured] a list of plan providers . . . A complete list of plan providers is available on [Humana]'s Web site (www.humana.com) **...** Customer Service can give you the most up-to-date information about changes in plan providers and about which ones are accepting new patients.

Compl. ¶ 40.  Sylvester Cancer Center is a Medicare-certified health care facility and the Humana website - then and now - designates the University of Miami's Sylvester Cancer Center as a plan provider. Compl. ¶ 41.  In addition to Humana's website, Humana's customer service and sales representatives, such as Brennan, promise to both current and prospective insureds that Sylvester is an in-network provider under its regional PPOs, specifically including the Policy issued to Plaintiff. Compl. ¶ 42.  The 2007 Humana Summary of Benefits Booklet states:

> There is a $5,000 maximum out-of-pocket limit every year for the following Medicare-covered plan services when received in-network only:  – Inpatient Hospital Care . . Doctor Office Visits . . Outpatient Services/Surgery . . Ambulance Services . . Emergency Care . . Urgently Needed Care . . . Outpatient Rehabilitation Services . . Durable Medical Equipment . . Diagnostic Tests, X-Rays, and Lab Services . . .

Compl. ¶43.  There is a $10,000 maximum out-of-pocket limit every year for such services if received from an out-of-network provider.  Compl. ¶ 43.  The Humana EOC Booklet adds:

> For certain covered services, the maximum amount that you will be required to pay for in-network services during a calendar year is $5,000.  Should you reach this maximum, no further copayment/coinsurance for these covered services will be required

> for the remainder of the calendar year.
> While most of your expenses will be applied to the annual out-of-
> pocket maximum, the following will not apply: your plan
> premium, routine dental services, diabetic supplies received at a
> pharmacy, outpatient prescription drugs, and foreign travel.

Compl. ¶ 44. Plaintiff did not see the stop loss provisions referenced in paragraphs 43 and 44.

Compl. ¶ 44. Assured by Brennan that his coverage remained the same and having received no

billings for medical services, Plaintiff continued to believe that his maximum cost exposure was

the sum of his premium and the $15.00 co-payments. Compl. ¶ 44.  Under the Summary of

Benefits, "Humana Choice PPO R5826-005 does cover both Medicare Part B prescription drugs

and Medicare Part D prescription drugs." Compl. ¶ 45.

Contrary to Humana's representations, Slyvester Cancer Center does not contract with the

Humana Medicare PPO, and never has. Compl. ¶ 46.  Sylvester only contracts with Humana

Medicare HMOs. Compl. ¶ 47.  Furthermore, and again contrary to Humana's representations,

Sylvester does not bill Humana at a discounted and/or negotiated rate under the Humana

Medicare PPO, but does so only for Humana Medicare HMOs. Compl. ¶ 47.  Despite Plaintiff's

express instructions before, during and after his application that he needed a product covering his

cancer care and treatment at Sylvester, the PPO Humana sold to Plaintiff does not cover

Sylvester as an in-network provider. Compl. ¶ 48.

In April 2007, when Plaintiff was gravely ill, and after sixteen (16) months of

uninterrupted and seemingly covered Sylvester cancer treatments under his Humana PPO,

Plaintiff began to receive bills and collection calls for his supposedly covered treatment. Compl.

¶ 49. Plaintiff contacted Humana to determine why Sylvester's medical bills were not being

covered and was met with nothing but the "bureaucratic double-step." Compl. ¶ 49.  Between

April and August 2007, Plaintiff spoke with Humana in the range of 15-20 times. Compl. ¶ 49.

Plaintiff frequently asked for a copy of an actual Policy, or some other document that would explain why he was not covered, but one never arrived. Compl. ¶ 49.  Humana ultimately provided a cryptic explanation for Plaintiff's situation – that Sylvester was "no longer a part of its network." Compl. ¶ 49.  In fact, Sylvester had never been part of Humana's network for the policy it sold Plaintiff. Compl. ¶ 49.  Despite Humana's promise to limit its insured's responsibility for out-of-pocket expenditures, Plaintiff was charged approximately $105,000 for services provided by Sylvester during his two Policy periods (2006-2007). Compl. ¶ 50.

On August 17, 2007, Sylvester contacted Plaintiff and advised that Humana was denying coverage on grounds that Sylvester was not part of Humana's network.  Compl. ¶ 51.  Plaintiff again contacted Humana, this time to advise that its agent had assured him Sylvester was an in-network provider under his Policy. Compl. ¶ 51.   Humana promised to "investigate," but refused to retreat from its denial of coverage while investigating.  Humana offered no assistance in dealing with the medical provider or collection agencies. Compl. ¶ 51.  In reality, Humana appears to have conducted no investigation. Compl. ¶ 51.

In an effort to avoid the negative impact on his credit in the face of Humana's intransigent refusal to pay for his medical services, and under pressure from a collection agency, on November 8, 2007, Plaintiff paid approximately $25,000 out of his own pocket to Sylvester's debt collection agency, BCA Financial Services, Inc. ("BCA") Compl. ¶ 52.  Plaintiff, by now in a state of desperation, again telephoned Humana, and was now told it was not their problem. Compl. ¶ 53.  Humana would do nothing, treated Plaintiff with complete indifference, and told him to raise his complaints with Medicare. Compl. ¶ 53.  Plaintiff immediately contacted Medicare and was told that he had to resolve the situation with Humana, as his Medicare benefits had already been assigned to Humana. Compl. ¶ 54.  Plaintiff telephoned Humana again

following Medicare's advice. Compl. ¶ 55.  This time, Humana told him he was required to

appeal its denial. Compl. ¶ 55. Plaintiff promptly appealed on August 19, 2007, two days after

being advised by Sylvester of Humana's denial.  Compl. ¶ 55.

The Humana EOC booklet sets forth the statutorily prescribed intricate process by which

an insured may appeal a decision to refuse payment on grounds the care is not covered:

> An organization determination is our initial decision about whether we
> will . . . pay for a service you have already received.  If our initial decision is to
> deny your request, you can appeal the decision by going on to Appeal Level 1 (see
> below).  You may also appeal if we fail to make a timely initial decision on your
> request.

Humana EOC Booklet at 76.  Compl. ¶ 56.  The EOC booklet further provides that "[if Humana

does] not approve your request for payment, [Humana] must tell you why, and tell you how you

can appeal this decision." Id. at 77.  Compl. ¶ 56.

On August 19, 2007, Plaintiff wrote Humana's Complaint Supervisor, making it clear

that he would not have purchased the Humana PPO health insurance plan if it were not for

Humana's misrepresentations regarding the in-network status of Sylvester and the limits on his

out-of-pocket exposure.  Compl. ¶ 57. Plaintiff sought reconsideration of Humana's initial

decision to deny coverage for the medical services and prescription drugs received at Sylvester.

Compl. ¶ 57.

On September 17, 2007 Letita Bailey ("Bailey"), a Humana Greivance and Appeal

Specialist, wrote Plaintiff "to acknowledge receipt of [his] request for an appeal (reconsideration)

of denied claim received on August 20, 2007." Compl. ¶ 58.  Bailey's letter stated that "[w]e are

currently reviewing the circumstances surrounding your appeal and will notify you of a decision.

We will normally make a decision within thirty (30) calendar days of receipt of your request.

Claims decisions require 60 days." Compl. ¶ 58.  The letter also explained that "[i]f, after review

of your case, our decision is to maintain the denial of your claim, your request and case will be forwarded to MAXIMUS Federal Services (MAXIMUS), the Centers for Medicare and Medicaid Services (CMS) contractor, for a final determination." Compl. ¶ 60.

Once an appeal is requested, Humana has "60 days to make a decision.  If [Humana] does not decide within 60 days, your appeal automatically goes to Appeal Level 2." EOC Booklet at 79. Compl. ¶ 61.  On November 10, 2007, after more than 60 days had passed, Plaintiff sent a follow-up letter to Humana to: (a) again request a copy of his Policy and (b) inquire about the status of his appeal. Compl. ¶ 62.  Nothwithstanding Humana's knowlege of Plaintiff's worsening health condition, rigorous chemotherapy regimen, and battle to stay alive in the face of incurable cancer, Humana did nothing. Compl. ¶ 62.

During Appeal Level 2, which had supposedly been triggered by Humana's silence, an independent review organization was supposed to review the appeal.  Compl. ¶ 63.  Humana "must send all the information about your appeal to the independent review organization within 60 days from the date [it] receive[s] the Level 1 appeal" and "tell you in writing that your appeal has been sent to this organization for review." EOC Booklet at 80. Compl. ¶ 63.  Humana must provide a copy of the case file if requested by the insured. EOC Booklet at 81. Compl. ¶ 63. Humana did not: (a) send Plaintiff's file to any independent review organization, (b) provide a copy of the case file to Plaintiff, or even (c) furnish a copy of the Policy. Compl. ¶ 64.  No "case file" was ever provided to Plaintiff. Compl. ¶ 64.

Had Humana sent Plaintiff's file to the government-contracted independent review organization, there are procedures and time-lines for successive steps of review outlined in the EOC booklet, which trace the procedures and time-lines required by law.  Compl. ¶ 65-66. Humana did not follow the applicable procedures and time-lines. Compl. ¶ 66.  Due to Humana's

failure to respond to Plaintiff's request for an appeal and failure to comply with its Policy and federal law (as well as with Plaintiff's need for a resolution due to his deteriorating health), on December 6, 2007, Plaintiff filed a Civil Remedy Notice ("CRN"), pursuant to Fla. Stat. § 624.155, with the Florida Department of Insurance Compliance. ¶ 67.  That same day, Plaintiff again wrote Humana, enclosing a copy of the CRN, inquiring about the status of his promised appeal, and requesting the written explanation of the reasons for Humana's denial of benefits required by Florida law. Compl. ¶ 67.

Humana sent a December 27, 2007 response, written by Melissa Thomas ("Thomas"), a Humana Greivance and Appeal Specialist, demanding that an "Appointment of Representative" form be filled out by Plaintiff's counsel prior to releasing information. Compl. ¶ 68.  This is despite the fact that all of the information requested could and should have been sent directly to Plaintiff long before. Compl. ¶ 68.

On January 18, 2008, Plaintiff wrote Thomas, enclosing the requested "Appointment of Representative" form and requesting acknowledgement of receipt. Compl. ¶ 69.  The January 18, 2008 letter also requested – again – that Humana send any documentation it believed supportive of its denial of the claim. Compl. ¶ 69.  More than 60 days passed since the filing of Plaintiff's Civil Remedy Notice, but Humana did not pay the claim, correct the circumstances giving rise to the CRN, or responding to the statutory notice or Plaintiff's request for his case file. Compl. ¶ 70.

On March 7, 2008, having heard nothing from Humana, Plaintiff wrote to Thomas again inquiring as to the status of his claim, reminding Humana that the entire administrative appeal period had lapsed without any word from Humana, and advising that Humana's immediate attention was necessary. Compl. ¶ 71.  Humana was aware of Plaintiff's precarious health. Compl. ¶ 71.  Humana nevertheless continued to ignore him. Compl. ¶ 72.  It did so with full

knowledge of Plaintiff's limited life expectancy, and did so either with the intention to stall and

distract him until he expired or, at the very least, with the reckless and outrageous indifference

and disregard for the physical and emotional well being of its own insured, as well as its

obligations under its Policy and Florida law. Compl. ¶ 72.

Finally, the Complaint alleges that Humana has, by its conduct, waived its right to compel

exhaustion of remedies through the administrative appeal process. Compl. ¶ 73.  The

administrative appeal process to which Plaintiff had been entitled, and that ordinarily would have

been a prerequisite to judicial reviw, has been intentionally abused, frustrated, and ultimately

completely derailed by Humana's arrogant and reckless misconduct. Compl. ¶ 74.  Plaintiff's

efforts to seek an administrative appeal have been futile and unreasonably delayed, and due to his

rapidly deterioriating and grave health condition the administrative process cannot supply an

adequate remedy. Compl. ¶ 75.  Plaintiff has been irreparably harmed by Humana's delay, and its

intransigence has contributed to the deterioration of his health. Compl. ¶ 75.

Defendant moves to dismiss the Complaint in its entirety.  It argues that all of the causes

of action alleged therein (except Count III - intentional infliction of emotional distress) are

preempted by federal Medicare law and that Plaintiff must first meet the presentment and

exhaustion requirements of the administrative appeals process before a  federal court can have

jurisdiction over his claims.  Defendant argues that Plaintiff's claim for intentional infliction of

emotional distress must be dismissed because a contract dispute cannot support that cause of

action and, furthermore, because Plaintiff has not alleged that he failed to receive necessary or

timely treatment.

Plaintiff responds that the Court should deny the motion to dismiss because his state law

claims are not preempted by federal Medicare laws. Plaintiff also claims that even his benefits

claim (Count I - breach of contract) should survive preemption due to Humana's alleged misconduct, i.e., its failure to properly channel Plaintiff's claims through the administrative appeal process.

**Standard of Review**

In deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a court must accept all factual allegations in a complaint as true and take them in the light most favorable to the plaintiff.  See Erickson v. Pardus, 127 S.Ct. 2197, 2200 (2007).  To satisfy the pleading requirements of Federal Rule of Civil Procedure 8, a complaint must contain a short and plain statement showing an entitlement to relief, and the statement must "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512 (2002) (citing Fed. R. Civ. P. 8); see also Bell Atlantic Corp. v. Twombly, 127 S.Ct. 1955, 1964 (2007); Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 346 (2005). This is a liberal pleading requirement, one that does not require a plaintiff to plead with particularity every element of a cause of action. Roe v. Aware Woman Ctr. for Choice, Inc., 253 F.3d 678, 683 (11th Cir. 2001).  Instead, the complaint need only "contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." Id. (internal citation and quotation omitted).  "A complaint need not specify in detail the precise theory giving rise to recovery.  All that is required is that the defendant be on notice as to the claim being asserted against him and the grounds on which it rests." Sams v. United Food and Comm'l Workers Int'l Union, 866 F.2d 1380, 1384 (11th Cir. 1989).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, [ ] a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief'

requires more than labels and conclusions, and a formulaic recitation of the elements of a cause

of action will not do." Bell Atlantic Corp. v. Twombly, 127 S.Ct. at 1964-65 (citations omitted).

"Factual allegations must be enough to raise a right to relief above the speculative level on the

assumption that all of the complaint's allegations are true." Id. at 1965. Plaintiff must plead

enough facts to state a plausible basis for the claim. Id.

**Discussion**

*Count I: Breach of Contract*

The Complaint alleges a claim for breach of contract against Humana for denying

payment under the policy for the cancer treatments and hospitalizations provided to Plaintiff at

the Sylvester Cancer Center. Compl. ¶ 77-81. In American Academy of Dermatology v.

Department of Health & Human Services, 118 F.3d 1495 (11th Cir. 1997), the Eleventh Circuit

explained the analysis for determining if a claim is preempted by the Medicare Act and whether

an administrative decision is ripe for judicial review as follows:

> Judicial review of benefit determinations under the Medicare Act is authorized by
> 42 U.S.C. § 1395ff(b)(1), which provides for judicial review only after the
> Secretary renders a final decision on the claim, in the same manner as is provided
> in 42 U.S.C. § 405(g) for claims arising under the Social Security Act. Judicial
> review of Medicare Act claims is circumscribed by 42 U.S.C. § 405(h), which
> provides that § 405(g), to the exclusion of 28 U.S.C. § 1331, is the sole avenue for
> judicial review for all claims for benefits 'arising under' the Medicare Act. See
> Heckler v. Ringer, 466 U.S. 602, 614-15 (1984).
>
> On its face, § 405(g) provides for judicial review only after a 'final decision' by
> the Secretary. The Supreme Court has explained that this 'final decision'
> requirement consists of two elements - (1) 'presentment': a nonwaivable,
> jurisdictional prerequisite that a benefits claim must be presented to the Secretary
> and (2) 'exhaustion': a waivable prerequisite that a claimant fully pursue all
> available administrative remedies before seeking judicial review. See Ringer, 466
> U.S. at 617; Mathews v. Eldridge, 424 U.S. 319, 328 (1976).

Id. at 1497-98 (footnotes omitted). Thus, the Court must first determine the "threshold question"

of whether a claim arises under the Medicare Act.  U.S. v. Blue Cross and Blue Shield of Alabama, Inc., 156 F.3d 1098, 1102 (11th Cir. 1998).

As the Supreme Court held in Ringer, the Court must determine whether the claim is "inextricably intertwined with [a] claim[ ] for benefits"or is "essentially one requesting the payment of benefits" 466 U.S. at 614, 620.  "In this round, we are to strike a balance between 'individual hardship resulting from delays in the administrative process ... [and] the potential for overly casual or premature judicial intervention in an administrative system that processes literally millions of claims every year.'" Kaiser v. Blue Cross of California, 347 F.3d 1107, 1112-13 (9th Cir. 2003), quoting Ringer, 466 U.S. at 627.

The Court concludes that Plaintiff's breach of contract claim, in which he seeks payments allegedly due under his health insurance Policy, is "essentially" a claim for benefits and therefore preempted by federal Medicare law.  Accordingly, the requirements of presentment and exhaustion under § 405(g) must be met prior to the exercise of judicial review. Ringer, 466 U.S. at 614-20, 627; American Academy of Dermatology, 118 F.3d at 1499.  Presentment is a "prerequisite that a benefits claim must be presented to the Secretary." Id. (emphasis added).

While the *Secretary* may waive the *exhaustion* requirement under certain circumstances[1], Mathews v. Eldridge, 424 U.S. 319, 330 (1976), *Humana* cannot waive the *presentment* requirement through its alleged misconduct.  Presentment is nonwaivable and jurisdictional. American Academy of Dermatology, 118 F.3d at 1498.  Lifestar Ambulance Service, Inc. v. U.S., 365 F.3d 1293 (11th Cir. 2004).  Because Plaintiff's breach of contract claim is preempted by

---

[1]The exhaustion requirement may be waived where a plaintiff meets three requirements, including that he shows irreparable injury if forced to exhaust his administrative remedies. Lifestar Ambulance Service, Inc. v. U.S., 365 F.3d 1293, 1296 n.5 (11th Cir. 2004).

federal Medicare law, and because Plaintiff has not yet presented his claim to the Secretary or exhausted his claim through the administrative appeals process, the Court is deprived of subject matter jurisdiction over the breach of contract claim. Cochran v. U.S. Health Care Financing Admin., 291 F.3d 775, 779 (11th Cir. 2002) ("Until a claimant has exhausted her administrative remedies by going through the agency appeals process, a federal district court has no subject matter jurisdiction over her lawsuit seeking to 'recover on any claim arising out of' the Medicare Act."); American Academy of Dermatology, 118 F.3d at 1501.  Accordingly, Count I: Breach of Contract is **DISMISSED WITHOUT PREJUDICE.**

### *Count II: Fraud in the Inducement*

The Complaint also alleges a claim for fraud in the inducement against Humana.  Plaintiff alleges that Humana misrepresented that its Regional PPO Policy would cover Plaintiff's treatments at the Sylvester Cancer Center as an in-network provider, when, in fact, Plaintiff's treatments were not covered as in-network.  These misrepresentations allegedly caused Plaintiff to purchase – and then to renew – the Humana PPO Policy, "leaving him susceptible to thousands more in medical expenses and unable to switch insurance providers."  Compl. ¶ 82-89. In essence, Plaintiff is seeking the benefit of the bargain, i.e., what he would have received had Humana's representations to him regarding his coverage under the Humana PPO Policy been accurrate.  As pled, Plaintiff's claim is "inextricably intertwined with claims for benefits" and is "essentially one requesting the payment of benefits" and therefore preempted by federal Medicare law. Ringer 466 U.S. at 614, 620.

While Plaintiff seeks both compensatory and punitive damages, the type of remedy sought is "not strongly probative" of whether the claim arises under Medicare. See Kaiser v. Blue Cross of California, 347 F.3d 1107, 1112 (9th Cir. 2003) ("The fact that the Kaisers seek damages

beyond the reimbursement payments available under Medicare does not exclude the possibility

that their case arises under Medicare."). As the Middle District explained in  Masey v. Humana,

Inc., 2007 WL 2788612, *3 (M.D. Fla. 2007):

> The fact that Plaintiff also seeks disgorgement of profits, punitive
> damages, attorneys' fees, and costs for her tort claims, but not her contract claims,
> is an artificial distinction designed to "circumvent[ ] the administrative process by
> creatively styling [her] benefits claims as collateral [claims] not 'arising under'
> Medicare." United States v. Blue Cross & Blue Shield of Ala., Inc., 156 F.3d
> 1098, 1104 (11th Cir. 1998); see also Am. Acad. of Dermatology v. Dep't of
> Health & Human Servs., 118 F.3d 1495, 1499 (11th Cir. 1997) (ruling that a claim
> seeking an order enjoining the Department of Health and Human Services from
> refusing to reimburse claims "clearly involves claims for benefits under the
> Medicare Act"). Her entitlement to additional remedies for her tort claims does
> not change the substance of the claims, which is that she had to incur costs that
> would have been covered by Medicare Part B if Defendants had not improperly
> classified her benefit claims.

Because Plaintiff's fraud in the inducement claim is preempted by federal Medicare law,

Plaintiff must proceed under 42 U.S.C. § 405(g), which requires that he satisfy the presentment

and exhaustion requirements under that subsection prior to seeking judicial relief.  Kaiser, 347

F.3d at 1115; see infra *Count I: Breach of Contract*.  As Plaintiff has not yet presented his claim

to the Secretary, or exhausted his claim through the administrative appeals process, the Court is

deprived of subject matter jurisdiction over the claim.  Cochran, 291 F.3d at 779; American

Academy of Dermatology, 118 F.3d at 1501. Accordingly, Count II: Fraud in the Inducement is

**DISMISSED WITHOUT PREJUDICE.**

*Count III: Intentional Infliction of Emotional Distress*

The Complaint alleges a claim for intentional infliction of emotional distress against

Humana for inducing him to purchase an insurance policy that did not cover his treatment,

refusing coverage for services and drugs provided to Plaintiff, and ignoring his appeals. Compl. ¶

90-99.  Defendant does not argue that this claim is preempted by federal Medicare law, but rather

moves to dismiss this count for failure to state a claim upon which relief can be granted.

Florida law recognizes the tort of intentional infliction of emotional distress as an independent cause of action. Metropolitan Life Ins. Co. v. McCarson, 467 So.2d 277, 278 (Fla. 1985). To state a cause of action for intentional infliction of emotional distress, a complaint must allege four elements: "(1) deliberate or reckless infliction of mental suffering; (2) outrageous conduct; (3) the conduct caused the emotional distress; and (4) the distress was severe." Liberty Mut. Ins. Co. v. Steadman, 968 So.2d 592, 594 (Fla. 2nd DCA 2007). Whether conduct is outrageous enough to support a claim for intentional infliction of emotional distress is a question of law, not a question of fact. Id. at 595; see also Baker v. Florida Nat. Bank, 559 So.2d 284, 287 (Fla. 4th DCA 1990) ("The issue of whether or not the activities of the defendant rise to the level of being extreme and outrageous so as to permit a claim for intentional infliction of emotional distress is a legal question in the first instance for the court to decide as a matter of law.").

> Behavior claimed to constitute the intentional infliction of emotional distress must be " 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency.' " Ponton v. Scarfone, 468 So.2d 1009, 1011 (Fla. 2d DCA 1985) (quoting Metropolitan, 467 So.2d at 278). In applying that standard, the subjective response of the person who is the target of the actor's conduct does not control the question of whether the tort of intentional infliction of emotional distress occurred. Id. Rather, the court must evaluate the conduct as objectively as is possible to determine whether it is " 'atrocious, and utterly intolerable in a civilized community.' " Id. (quoting Metropolitan, 467 So.2d at 278).

Liberty Mut., 968 So.2d at 594-95.

While the conduct alleged, if true, is clearly wrong, it does not meet the standard of being "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious, and utterly intolerable in a civilized community."

<u>Metropolitan</u>, 467 So.2d at 278-79 quoting Restatement (Second) of Torts § 46 (1965). <u>See e.g.,</u> <u>Williams v. Southeast Florida Cable, Inc.</u>, 782 So.2d 988 (Fla. 4th DCA 2001) (holding trial court did not err in dismissing claim for intentional infliction of emotional distress where the alleged conduct did not rise to the level of outrageousness required under Florida law). Accordingly, Count III: Intentional Infliction of Emotional Distress is **DISMISSED WITHOUT PREJUDICE** for failure to state a claim upon which relief can be granted.

***Count IV: Statutory Bad Faith***

The Complaint alleges a claim for statutory bad faith against Humana for failing to act in good faith with regard to Plaintiff's claim. Compl. ¶ 100-107. Under Florida law, a bad faith claim does not accrue until the conclusion of the underlying contract claim. <u>See</u> <u>Blanchard v.</u> <u>State Farm Mut. Auto. Ins. Co.</u>, 575 So. 2d 1289, 1291 (Fla.1991) ("[A]bsent a determination of the existence of liability on the part of the UM tortfeasor and the extent of the plaintiff's damages, a cause of action cannot exist for a bad faith failure to settle."). Plaintiff's bad faith claim is premature before the coverage litigation is adjudicated. <u>See, e.g.,</u> <u>Vest v. Travelers Ins.</u> <u>Co.</u>, 753 So. 2d 1270, 1276 (Fla. 2000) (dismissing as premature a bad faith claim which had been brought before liability and damages had been awarded to first-party insured). Accordingly, because the Court concludes that Plaintiff's bad faith cause of action has not yet accrued, Count IV - Statutory Bad Faith is **DISMISSED WITHOUT PREJUDICE** to refile after the coverage determination is made.

**<u>Conclusion</u>**

For the reasons stated herein, Defendant, Humana Insurance Company ("Defendant" or "Humana")'s Motion to Dismiss (DE 11) is **GRANTED IN PART AND DENIED IN PART** as follows:

1.	The breach of contract claim (Count I) and fraud in the inducement claim (Count II) are

	**DISMISSED WITHOUT PREJUDICE** for lack of subject matter jurisdiction.

2.	The intentional infliction of emotional distress claim (Count III) is **DISMISSED**

	**WITHOUT PREJUDICE** for failure to state a claim upon which relief can be granted.

3.	The statutory bad faith claim (Count IV) is **DISMISSED WITHOUT PREJUDICE** as

	premature before the coverage litigation is adjudicated.

4.	Plaintiff is granted leave to amend the Complaint, consistent with this Order.

	**DONE AND ORDERED** in Chambers at West Palm Beach, Palm Beach County,

Florida, this 23rd day of February, 2009.

_____
KENNETH A. MARRA
United States District Judge

copies to:
All counsel of record